IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

CHRISTOPHER LENAR PUGH,       )
                              )
        Plaintiff,            )
                              )
v.                            )          CIVIL ACTION NO. 09-00016-KD-N
                              )
RICHARD DIX, et al.,          )
                              )
        Defendants.           )

REPORT AND RECOMMENDATION

Plaintiff, an Alabama prison inmate proceeding pro se and in forma pauperis, filed

a complaint under 42 U.S.C. § 1983. (Docs. 10, 14). Pursuant to the Order entered on

February 23, 2010 (doc. 58), all of plaintiff's claims were dismissed *except* his claims of

excessive force against defendants Richard Dix and Brent Guy and his claims of

unreasonable search and seizure of property against defendants Richard Dix, Brent Guy,

and Jana Dukes.

This action has been referred to the undersigned for a report and recommendation

pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.2(c)(4) and is now before the

Court on: (1) defendants' Special Report (doc. 90, 95), Answer (doc. 91) and

Memorandum (doc. 105), which have been converted to a motion for summary judgment

(doc. 106); (2) plaintiff's various responses in opposition thereto (docs. 111-114, 123);

and (3) defendant's reply (docs. 119 and 123). This action is also before the Court on

plaintiff's motion for judgment on the pleadings (docs. 111 and 118), defendants'

response in opposition thereto (doc. 120), and plaintiff's reply (doc. 123). Upon

consideration of these documents and all other pertinent portions of the record, it is recommended that Pugh's motion for judgment on the pleadings be **denied** and that the defendants' motion for summary judgment be **granted**.

## I.    PROCEDURAL BACKGROUND

Plaintiff initially filed this action on January 1, 2009 (doc. 1). On January 23, 2009, plaintiff filed two separate motions to amend his complaint. On February 25, 2009, pursuant to the Court's Order (doc. 9), plaintiff filed a complaint using the Court's form (doc. 10) but thereafter sought to amend the complaint to add new defendants and claims (doc. 30). On January 27, 2010, the undersigned entered a Report and Recommendation (doc. 53) recommending that "all portions of this action EXCEPT plaintiff's claims for excessive use of force against defendants Dix and Guy and his claims for unreasonable search and seizure against defendants Dix and Dukes, be dismissed, without prejudice, pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii), and 28 U.S.C. § 1915A(b)(1) for failure to state a claim upon which relief may be granted by virtue of the principles set forth in Heck v. Humphrey, 512 U.S. 477 (1994)." On February 23, 2010, the District Court adopted (doc. 58) the Report and Recommendation over plaintiff's objections (doc. 56), and dismissed all claims *except* the claims of excessive force against defendants Dix and Guy and the unreasonable search and seizure against Dix, Guy and Dukes. These defendants were served on March 16, 2010 (docs. 62-64) and filed their Answer and

Special Report (docs. 90-91) on July 20, 2010.[1] The defendants subsequently filed, as

directed by the Court (doc. 94), a memorandum of law in support of their Special Report

(doc. 105) and their affirmative defenses.[2] On September 3, 2010, the Court converted

defendants' Answer, Special Report and Memorandum of Law into a motion for

summary judgment (doc. 106) and directed the plaintiff to respond by October 14, 2010.

The issues have now been fully briefed and the matter taken under submission.[3]

II.     FINDINGS OF FACT

Upon review of all the evidence of record, both documentary and testimonial, the

following relevant facts are either undisputed or uncontradicted by the plaintiff:[4]

1.      Defendants Richard Dix, Brent Guy, and Jana Dukes were sworn law

enforcement officers with the City of Satsuma Police Department at the time of the

incidents made the basis of the complaint. (Doc. 85 at 7-9). The events which give rise to

this lawsuit occurred during the Plaintiff's arrest on February 12, 2007. (*Id.*).

---

[1] On June 29, 2010, plaintiff filed another motion (doc. 83) for leave to amend his complaint. The Court granted the motion (doc. 84) and the Amended Complaint (doc. 85) which now governs this action was filed by the plaintiff on July 8, 2010.

[2] On July 29, 2010, pursuant to the leave granted by this Court (doc. 93), defendants also filed under seal (doc. 95) a copy of plaintiff's medical records from the Mobile Metro Jail. Plaintiff's subsequent contention (doc. 114) that the Court's Order (doc. 93) directing that these medical records be filed **under seal** somehow violates his constitutional rights is without merit. Orders protecting medical records from public exposure are required by federal law. *See e.g.*, Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191, 110 Stat. 1936 (1996) ("HIPAA").

[3] Pugh has filed a number of motions (docs. 97, 98, 100, 101, 110, 111, 117, 118, 122, and 125) which have been ruled on by the Court (docs. 104, 113, and 127) and are not relevant to defendant's motion for summary judgment.

[4] As it is required to do on defendants' motion for summary judgment, the court has construed all facts in the light most favorable to the plaintiff.

2.       On the evening of February 11, 2007, Pugh had been to a club in Prichard. (Pugh Depo. (doc. 90-2) at p. 18). Pugh met someone at the club named Joe who asked Pugh to take him home. (*Id.*). According to Pugh, he did not know Joe or Joe's last name or where Joe lived but he was nonetheless taking Joe home around midnight. (*Id*). Pugh admits that he pulled into the parking lot of a closed Dollar General Store off of Highway 43 in Satsuma a little after midnight. (*Id.*). Pugh was driving his car, a Saab. (*Id.* at p. 31).

3.       Officers with the Satsuma Police Department perform close patrols of the businesses in the City at night. (Dix Aff. (doc. 90-3) at ¶ 2)[5]. The officers call in each area that they patrol over the radio so that the dispatcher can log in the information. (*Id.*) Alabama Title Loan is located on Highway 43 and the Dollar General store is directly behind the Alabama Title Loan building. (*Id.* at ¶ 3). Officers Guy and Dix were on patrol on the evening of February 11, 2007 and early hours of February 12, 2007. (Dix Aff. (doc. 90-3) at ¶ 2; Guy Aff. (doc. 90-4) at ¶ 2). Officer Guy had patrolled the area of Alabama Title Loan and the Dollar General Store at 12:18 a.m. and called it in over the radio. (Guy Aff. (doc. 90-4) at ¶ 2)[6].

---

[5] Despite Pugh's contentions to the contrary (docs. 111, 117-1), Dix's affidavit testimony does not contradict his prior statement in the police report he prepared on February 12, 2007 at 2:05 a.m. (Doc. 90-3).

[6] Pugh's contention (docs. 111 at 2, 117-1 at 3) that Guy's affidavit is invalid because it is unsupported with any "evidence to support a finding that he has personal knowledge of the matter sworn to" and contradicts the use of force form (doc. 111 at 21) Guy prepared on February 12, 2007, is without merit.

4.      As Officer Dix later drove past the area of the Dollar General store and Alabama Title Loan, he noticed a vehicle without any lights on sitting in the parking lot. (Dix Aff. (doc. 90-3) at ¶ 3).  Officer Dix asked Guy if the car had been in the parking lot when Guy had patrolled the area earlier that same evening. (Dix Aff. (doc. 90-3) at ¶ 3; Guy Aff.  (doc. 90-4) at ¶ 2).  Officer Guy responded that there were no cars in the parking lot during his earlier patrol.  (Guy Aff.  (doc. 90-4) at ¶ 2).  Officer Dix made a u-turn on Highway 43, but the car drove off as Officer Dix approached Alabama Title Loan.  (Dix Aff. (doc. 90-3) at ¶ 3).  Pugh denies that he was either parked or had his car lights off.  (Pugh Declaration (doc. 112) at 1).  According to Pugh, he was simply "making a u-turn in the Dollar General Store Parking Lot on Date: February 12th, 2007." (*Id*.).  Pugh states in his complaint that he was "in the process of using a cell phone" while in the Dollar General store parking lot. (Doc. 85 at 4).  Pugh confirmed that during his deposition, stating "you don't want to use a cell phone while you're driving."   (Pugh Depo. (doc. 90-2) at p. 20). Pugh admits that he pulled out of the Dollar General parking lot onto Highway 43 north.  (Pugh Depo. (doc. 90-2) at pp. 9 and 20).  Officer Dix radioed to Officer Guy, who was then traveling south on Highway 43, that the vehicle had pulled out heading north on Highway 43. (Guy aff. (doc.90-4) at ¶ 2).  Although the speed limit on Highway 43 is 45 miles per hour, Pugh accelerated to approximately 60 miles per hour as he passed Officer Guy.  (Dix aff. (doc. 90-3) at ¶ 3).

5.      Pugh noticed flashing police lights in his rearview mirror and pulled over to the right side of the road.   (Pugh Depo. (doc. 90-2) at p. 10).  Officer Dix pulled up about

thirty (30) feet behind Pugh. (*Id*. at pp. 10 and 26). Officer Guy had activated the blue flashing lights on his vehicle and crossed over the median from the south side of Highway 43 to pull in behind Officer Dix. (*Id*. at pp. 10 and 27-29). Before the officers could get out of their cars to reach Pugh, Pugh quickly pulled back onto Highway 43 and drove off. (*Id*. at pp. 10 and 32-33; Dix Aff. (doc. 90-3) at ¶ 3; Guy Aff. (doc, 90-4) at ¶ 2). Both Officers Dix and Guy pursued the vehicle. (Dix Aff. (doc. 90-3) at ¶ 3; Guy Aff. (doc. 90-4) at ¶ 2).

6.     Officer Dix caught up to Pugh's car and then passed him, while Officer Guy pulled up behind Pugh. (Pugh Depo. (doc. 90-2) at pp. 32-33). Pugh testified in his deposition that he was only going "30 or 40" miles per hour (doc. 90-2 at 37); he has also contended that Dix and Guy were driving "at the accelerated speed of 55 to 60 miles per hour" when Guy "drove close behind, as if he was trying to hit [Pugh] from behind" while, at the same time, Dix "pulled in front of [Pugh]" (doc. 85 at 5). There is some dispute about which driver applied his brakes first.[7] Pugh admits, however, that he spun "360" degrees and came to a stop in the median. (*Id*. at pp. 11, 33)[8]. Pugh's car stalled as a result of the spin. (*Id*. at p. 35). Both Dix and Guy exited their vehicles and began running towards Pugh's car. (*Id*. at pp. 35-36). Pugh testified that he had his windows

---

[7] Defendants aver that Pugh hit the brakes (doc. 90 at ¶ 14), while Pugh contends that "Officer Dix hits brakes [and caused me to do a 360 (doc. 90-2 at p. 11).

[8] Although Pugh contends that Guy was trying to hit Pugh from behind while Dix was trying to get Pugh to hit him from behind (docs. 85 at 5 and 90-2 at 33), Pugh does not remember either police vehicle hitting his car (doc. 90-2 at 33) and there is no evidence in this record that any of the three vehicles ever collided with one or the other.

up and could not hear the officers say anything to him. (*Id*. at p. 36). Pugh restarted his car and drove off again as Dix and Guy approached. (*Id*. at pp. 11, 36). This time, Pugh headed South on Highway 43, the opposite direction from which he had been traveling. (*Id*. at p. 36). Both officers once again pursued the fleeing vehicle. (*Id*. at p. 37; Dix Aff. (doc. 90-3) at ¶ 3; Guy Aff. (doc, 90-4) at ¶ 2). Officer Dix again pulled in front of Pugh and Officer Guy drove up to the rear of Pugh's vehicle. (Pugh depo. (doc. 90-2) at pp. 37-38). Pugh "mash[ed] the brakes again" and began to spin before coming to rest in the ditch on the side of the road facing the opposite way of traffic. (*Id*. at pp. 12, 38). One of his tires had blown out. (*Id*. at 39).

7.      Once Pugh's car stopped, he took off running. (*Id*. at pp. 12, 40-41). Pugh's passenger, Joe, began running in a different direction. (*Id*. at pp. 39-40). Pugh was about sixty (60) feet from the car when Officer Guy grabbed him around the legs. (*Id*. at p. 41). Pugh was still walking with Officer Guy hanging on when Officer Dix jumped on Pugh's back causing Pugh to fall to his knees. (*Id*. at pp. 12-13, 41). Officer Guy tried to tase Pugh, but was unsuccessful. (*Id*. at pp. 13, 41-42), and Pugh turned over and started getting back up. (*Id*. at pp. 13, 42). When asked if he was still trying to get away after Officer Guy unsuccessfully attempted to use his taser, Pugh answered "Heck, yeah." (*Id*. at p. 47). Pugh contends that Officer Dix "started hitting me with the metal flashlight or baton on my head." (*Id*. at p. 42). Officer Dix denies ever striking Pugh with a baton or metal flashlight but had to struggle with Pugh to take him into custody. (Dix Aff. (doc. 90-3) at ¶ 3).

8.      Pugh finally gave up and the officers were able to handcuff him. (Pugh depo. (doc. 90-2) at pp. 13-14). Pugh does not know which one of the officers handcuffed him, but Officer Dix took him to the police car, (*Id*. at pp. 14, 51) and transported Pugh to the Satsuma Police Department for booking. ( (Dix Aff. (doc. 90-3) at ¶ 4; (Pugh depo. (doc. 90-2) at pp. 62-63). Pugh was arrested for resisting arrest and possession of burglary tools. (*Id*.).

9.      When Pugh arrived at the police department, Officer Dix completed some paper work. (Pugh depo. (doc. 90-2) at p. 53). Officer Dix reached in Pugh's pocket and took Pugh's money out while he was still handcuffed, put the money on the desk and counted it. (*Id*.). A pat down search of Pugh had not been performed before he had been put in the police car. (*Id*.). Pugh provided Officer Dix with his name and address, but refused to answer any questions concerning what had happened earlier that night. (*Id*. at pp. 54-55). Pugh does not recall telling anyone at the Satsuma Police Department that he was injured. (*Id*. at p. 62).

10.     Pugh was transported to Mobile County Metro Jail in Mobile. (*Id*. at p. 57). A copy of Pugh's records from the Medical Department of the Mobile County Metro Jail have been filed under seal. (Doc. 95). These records do not reflect any complaint of injury by Pugh[9] and Pugh has not alleged that he ever complained to anyone at Mobile County Metro Jail of any injury associated with his arrest by Dix and Guy or otherwise.

---

[9] On his "Jail Medical History and Screening" form, Pugh expressly denied having any "bleeding or injuries that require immediate medical attention" or "a head injury within the past six months." (Doc. 95 at p. 8)

11.     Based on his subsequent reading of the police reports, Pugh contends that

Sergeant Jana Dukes unlawfully conducted an inventory search of the vehicle he was

driving.  (Pugh depo. (doc. 90-2) at p. 16).  However, Pugh was not present when

Sergeant Dukes searched his vehicle and Pugh's claim against Dukes is based solely on

the fact that she searched his vehicle.  (*Id*. at pp. 65, 67).  Sergeant Dukes had been

contacted to process a vehicle involved in a police chase because the driver had attempted

to elude Satsuma police officers.  (Dukes Aff. (doc. 90-5) at ¶ 2).  Sergeant Dukes

conducted an inventory search of Pugh's vehicle pursuant to Satsuma Police Department

policy regarding towing vehicles. (*Id*. at ¶ 2 and Ex. 1).  The search yielded two (2) bags

of coins totaling $855.00, two (2) sledge hammers, a side grinder, and pry bars. (*Id*. at

Ex. 2).  Pugh admits to having those items in his car prior to his arrest, with the exception

of $855.00 in coins. (Pugh depo. (doc. 90-2) at pp. 70-71).

12.     On the morning after Pugh's arrest, the Saraland Police Department

received a report of a burglary at the P&S Check Exchange located at 514 Highway 43 in

Saraland.  (Dukes Aff. (doc. 90-5) at ¶ 3).  The burglary had been discovered on

February 12, 2007, by the manager of P & S Check Exchange, Ms. Sandra Thomas, upon

arriving at work.  (*Id*.).  Sergeant Dukes obtained a copy of the report from the Saraland

Police Department and then interviewed Ms. Thomas. (*Id*.)  The wires on the side of the

building had been cut, including the power to the alarm system, and the back door had

been forcibly opened with a tool. (*Id*.). Ms. Thomas provided a written statement

regarding the burglary and what had been taken during the burglary, which included

several rolls of coins and a cloth bag full of nickels had been taken. (*Id*.).  In addition,

Ms. Thomas' personal phone bill had been taken, which was found on the person of Christopher Pugh at the time of his arrest. (*Id*. at ¶ 3 and Ex. 4).  Pugh was charged with receiving stolen property.  (*Id*. at ¶ 3 and Ex. 5).

13.     On December 8, 2006, Pugh was indicted by the Grand Jury on charges of burglary of the Money Store on April 15, 2006.  (Doc. 90-6 at 14).

14.     On July 27, 2007, Pugh was indicted by the Grand Jury with the charge of receipt of stolen property belonging to P & S Check Exchange.  (Doc. 90-8 at 14).  On that same date, he was indicted on charges of burglary of Alabama Title Loans.  (Doc. 90-9 at 9). Pugh was also indicted on July 27, 2007, with the charge of possession of burglary tools.  (Doc. 90-10 at 11).  These three (3) pending cases were consolidated.  *See e.g.*, (Doc. 90-10 at 37).

15.     On September 28, 2007, Pugh was indicted by the Grand Jury on charges of burglary of Title Max on January 16, 2007.  (Doc. 90-11 at 13).

16.     Pugh entered into a plea agreement with regard to the charges filed against him based upon the events of February 12, 2007. (Pugh depo. (doc. 90-2) at p. 69). On March 17, 2008 Pugh pled guilty to two (2) counts of burglary, third degree in the Circuit Court of Mobile County for burglary of the Money Store and Title Max. (Doc. 90-6 at 8; Doc. 90-11 at 7).  Pugh also pled guilty to receiving stolen property belonging to P & S Check Exchange, second degree in the Circuit Court of Mobile County. (Doc. 90-8 at 7).

17.     On June 13, 2008, Pugh was sentenced to fifteen (15) years in each of the three cases (doc. 90-6 at 10; doc. 90-8 at 10; doc. 90-11 at 9), with his sentences to run concurrent. At the time of his deposition, Pugh was serving his sentence at Perry County

Correctional Center. (Pugh depo. (doc. 90-2) at pp. 6-7). At the present time, Pugh is serving his sentence at Kilby Correctional Facility. (Doc. 108).

18.     At the time of his arrest on February 12, 2007, Pugh was on probation (Pugh depo. (doc. 90-2) at p. 69), which was ultimately revoked. (*Id*. at pp. 69-70).

19.     Pugh does not dispute that he was found guilty of reckless driving and attempting to elude the police as a result of his actions on February 12, 2007. (Doc. 90-12 at 2, 5). He was sentenced to six (6) days in jail. (*Id*.).

III.     SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment should be granted when, "after an adequate time for discovery, a party fails to make a showing sufficient to establish the existence of an essential element of that party's case." *See* McDowell v. Brown, 392 F.3d 1283, 1288 (11th Cir. 2004) (*citing* Nolen v. Boca Raton Community. Hosp., Inc., 373 F.3d 1151, 1154 (11th Cir. 2004) (*citing* Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)).

All issues of material fact are first resolved in favor of the plaintiff, followed by a determination of whether the defendant is entitled to judgment as a matter of law under that version of the facts. McDowell, 392 F.3d at 1288 (*citing* Durruthy v. Pastor, 351 F.3d 1080, 1084 (11th Cir. 2003). There exists no genuine issue of material fact, and summary judgment is due to be granted, when "the evidence could not lead a rational fact-finder to find for the nonmoving party, and where the nonmoving party fails to make a sufficient showing to demonstrate an element essential to that party's case, on which

that party bears the burden of proof at trial." McDowell, 392 F.3d at 1288-89 (*citing*

Celetex Corp. v. Catrett, 477 U.S. at 322-23; and Holbrook v. City of Alpharetta, 112

F.3d 1522, 1525-26 (11th Cir. 1997). "[G]enuine disputes are 'those in which the

evidence is such that a reasonable jury could return a verdict for the non-movant [and]

[f]or factual issues to be considered genuine, they must have a real basis in the record'."

McDowell, 392 F.3d at 1289 (*quoting* Mize v. Jefferson City Bd. of Educ., 93 F.3d 739,

742 (11th Cir. 1996). In addition, plaintiff must "go beyond the pleadings and by [her]

own affidavits, or by the depositions, answers to interrogatories, and admissions on file,"

establish that genuine issues of material fact exist to be resolved at trial, because plaintiff

bears the burden of proof at trial. Fed.R.Civ.P. 56(e); Celotex, 477 U.S. at 324;

Freeman v. Town of Eatonville, Fla., 2006 WL 3078928, *2 (11th Cir., November 1,

2006).

With specific respect to the resolution of a summary judgment motion based on

qualified immunity, the Eleventh Circuit has declared:

> [W]e approach the facts from the plaintiff's perspective because "[t]he
> issues appealed here concern not which facts the parties might be able to
> prove, but, rather, whether or not certain given facts showed a violation of
> clearly established law." Sheth v. Webster, 145 F.3d 1231, 1236 (11th Cir.
> 1998). As this Court has repeatedly stressed, the "facts, as accepted at the
> summary judgment stage of the proceedings, may not be the actual facts of
> the case". Priester v. City of Riviera Beach, 208 F.3d 919, 925 n. 3 (11th
> Cir. 2000). Nevertheless, for summary judgment purposes, our analysis
> must begin with a description of the facts in the light most favorable to the
> plaintiff. *See* Skrtich v. Thornton, 280 F.3d 1295, 1299 (11th Cir. 2002).

McCullough v. Antolini, 559 F.3d 1201, 1202 (11th Cir. 2009). "Because qualified

immunity is a defense not only from liability, but also from suit, it is 'important for a

court to ascertain the validity of a qualified immunity defense as early in the lawsuit as possible'." Benton v. Hopkins, 190 Fed.Appx. 856, 858 (11th Cir. 2006), *quoting* Lee v. Ferraro, 284 F.3d 1188, 1190 (11th Cir.2002)(internal citation omitted).

Under Saucier v. Katz, 533 U.S. 194 (2001) , the "threshold question" to be determined before any other inquiry is: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" 533 U.S. at 201.   Only if the answer to that question was affirmative, may the court proceed to determine "whether the right was clearly established ... in light of the specific context of the case, not as a broad general proposition." *Id.*   The two-part inquiry established in Saucier is, however, no longer mandatory.  Pearson v. Callahan, ---- U.S. ----, 129 S.Ct. 808, 818 (2009) ("The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.").

IV.   ANALYSIS

"Public officials are entitled to qualified immunity so long as their discretionary actions do not violate clearly established statutory or constitutional rights."  Autery v. Davis, 2009 WL 3792403, * 2 (11th Cir. Nov. 12, 2009).  "Qualified immunity is a privilege that provides 'an immunity from suit rather than a mere defense to liability'." Townsend v. Jefferson County, 582 F.3d 1252, 1258 (2009)(emphasis in original). *See also* McCullough, *supra*, 599 F.3d  at 1205 ("Qualified immunity offers complete protection for government officials sued in their individual capacities as long as their

conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known."); Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002)(same). "The purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002)(internal quotation marks and citations omitted).

The defense of qualified immunity is first predicated on a showing by the defendant police officer that "he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." Wood v. Kesler, 323 F.3d 872, 877 (11th Cir. 2003); Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002). The Eleventh Circuit has further stated that "[q]ualified immunity is available to a governmental official – even if his actions appear to be ministerial in nature – so long as the official's actions '(1) were undertaken pursuant to the performance of his duties' and '(2) were within the scope of his authority.'" Jordan v. Doe, 38 F.3d 1559, 1566 (11th Cir. 1994) (quoting Rich v. Dollar, 841 F.2d 1558, 1563-64 (11th Cir. 1988)). The Eleventh Circuit has clarified the requirements to establish if an official was acting in his discretionary authority as follows:

> "However, 'the inquiry is not whether it was within the defendant's authority to commit the allegedly illegal act. Framed that way, the inquiry is no more than an untenable tautology.' In applying each prong of this test, we look to the general nature of the defendant's action, temporarily putting aside the fact that it may have been committed for an unconstitutional purpose, in an unconstitutional manner, to an unconstitutional extent, or under constitutionally inappropriate circumstances."

Holloman, ex rel. Holloman v.Harland, 370 F.3d 1252, 1266 (11th Cir. 2004)(*citing* Harbert Int'l, Inc. v. James, 157 F.3d 1271, 1282 (11th Cir. 1998)(quotations marks and citations omitted)). *See also*, Stoddard v. Hawsey, 2007 WL 2156416, * 5, n. 8 (S.D. Ala. July 26, 2007)("Put another way, to pass the first step of the discretionary function test for qualified immunity, the defendant must have been performing a function that, but for the alleged constitutional infirmity, would have fallen with his legitimate job description.")(*quoting* Holloman, 370 F.3d at 1266); Crosby v. Monroe County, 394 F.3d 1328, 1332 (11th Cir. 2004)("To determine whether an official was engaged in a discretionary function, [courts] consider whether the acts the official undertook are of a type that fell within the employee's job responsibilities.").

Pugh does not dispute that the defendant police officers were acting within the scope of their discretionary authority with respect to the events made the basis of this litigation. Defendants Dix, Guy, and Dukes were officers with the Satsuma Police Department. The actions taken by Defendants Dix and Guy in arresting Pugh were undertaken pursuant to the performance of their duties and within the scope of their authority as officers for the Satsuma Police Department. The actions of Dix in searching Pugh's person incident to his arrest and Dukes' actions in searching Pugh's vehicle incident to his arrest were actions undertaken pursuant to the performance of their duties and within the scope of their authority as officers for the Satsuma Police Department.

Because the defendant police officers established that they were acting within their discretionary authority, the burden then shifts to the plaintiff to show that it would be

inappropriate for the police officers to receive qualified immunity in this case. Lee, 284 F.2d at 1194. To meet his burden, Pugh must first show that, "[t]aken in the light most favorable to the party asserting the injury, the facts alleged show the officer's conduct violated a constitutional right." *Id.*, *quoting* Saucier, 533 U.S. at 201. "[I]f a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." *Id.*[10]

A.    Excessive Force Claim.

Pugh's claims of excessive force against Dix and Guy must be analyzed under the Fourth Amendment.[11] The Supreme Court has specifically ruled that:

> Where, as here, the excessive force claim arises in the
> context of an arrest or an investigatory stop of a free citizen, it
> is most properly characterized as one invoking the protections
> of the Fourth Amendment, which guarantees citizens the right

---

[10] The second step of the inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." Lee, 284 F.2d at 1194. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier, 533 U.S. at 202, *citing* Wilson v. Layne, 526 U.S. 603, 615 (1999) ("[A]s we explained in Anderson, the right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established"). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." Hope v. Pelzer, 536 U.S. 730, 739 (2002) (internal quotations and citations omitted). In other words, plaintiff must show that the defendant police officers had "fair warning" that his alleged conduct was unconstitutional. *Id.* at 741. *See also* Pearson, *supra*, 129 S.Ct. at 818-21 (The process for establishing a qualified immunity defense can be tailored to the details of a particular case.).

[11] It is the Fourth Amendment which applies to a claim alleging a police officer used excessive force in effecting the initial arrest of a suspect, while the due process clause of the Fourteenth Amendment governs the treatment of pre-trial detainees. Graham v. Connor, 490 U.S. 386, 394 (1989); Lancaster v. Monroe County, Ala., 116 F.3d 1419, 1425 (11th Cir. 1997). The Fifth Amendment's due process clause only applies to the federal government and is, therefore, inapplicable in this case. See e.g., Strickland v. City of Dothan, 399 F.Supp.2d 1275, 1284 (M.D. Ala. 2005). Any claims asserted by Pugh for excessive force under the Fifth Amendment are therefore due to be dismissed.

'to be secure in their persons . . . against unreasonable
seizures' of the person. . . . [*A*]*ll* claims that law enforcement officers have
used excessive force—deadly or not—in the course of an arrest,
investigatory stop, or other "seizure" of a free citizen should be analyzed
under the Fourth Amendment and its "reasonableness" standard, rather than
under a "substantive due process" approach. Because the Fourth
Amendment provides an explicit textual source of constitutional protection
against this sort of physically intrusive governmental conduct, that
Amendment, not the more generalized notion of "substantive due process,"
must be the guide for analyzing these claims.

Graham v.Connor, 490 U.S. 386, 394 (1989)(emphasis in original).

The Fourth Amendment standard for analyzing an excessive force claim requires a

"careful balancing of 'the nature and quality of the intrusion on the individual's Fourth

Amendment interests' against the countervailing governmental interests at stake."

Graham, 490 U.S. 395-96, *quoting* Tennessee v. Garner, 471 U.S. 1, 8 (1985). "The

'reasonableness' of a particular use of force must be judged from the perspective of a

reasonable officer on the scene, rather than with the 20/20 vision of hindsight." 490 U.S.

at 397, *citing* Terry v. Ohio, 392 U.S. 1, 20-22 (1968). The court must look to see

whether the actions of the individual officer are 'objectively reasonable' in light of the

facts and circumstances confronting the officer at that time. 490 U.S. at 397, *citing* Scott

v. United States, 436 U.S. 128, 137–139 (1978); Terry, 392 U.S. at 21. The Supreme

Court emphasized that "'not every push or shove, even if it may later seem unnecessary

in the peace of a judge's chambers,' violates the Fourth Amendment." 490 U.S. at 396,

*quoting* Johnson v. Glick, 481 F.2d 1028, 1033 (2nd Cir. 1973).

In addition, the Supreme Court reiterated that it has "long recognized that the right

to make an arrest or investigatory stop necessarily carries with it the right to use some

degree of physical coercion or threat thereof to effect it." Graham, 490 U.S. at 396.

Consequently, when applying the "objective reasonableness" standard in a Fourth

Amendment excessive force case, this Court must pay "careful attention to the facts and

circumstances of each particular case, including the severity of the crime at issue,

whether the suspect poses an immediate threat to the safety of the officers or others, and

whether he is actively resisting arrest or attempting to evade arrest by flight." 490 U.S. at

396, *citing* Tennessee v. Garner, 471 U.S. at 8-9. The Supreme Court also expressly

declared that "[t]he calculus of reasonableness must embody allowance for the fact that

police officers are often forced to make split-second judgments—in circumstances that

are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in

a particular situation." 490 U.S. at 396-97. The Supreme Court has further explained:

> [W]e have traditionally recognized that a responsible Fourth Amendment
> balance is not well served by standards requiring sensitive, case-by-case
> determinations of government need, lest every discretionary judgment in
> the field be converted into an occasion for constitutional review. *See, e.g.*,
> United States v. Robinson, 414 U.S. 218, 234–235 . . . (1973). Often
> enough, the Fourth Amendment has to be applied on the spur (and in the
> heat) of the moment, and the object in implementing its command of
> reasonableness is to draw standards sufficiently clear and simple to be
> applied with a fair prospect of surviving judicial second-guessing months
> and years after an arrest or search is made. Courts attempting to strike a
> reasonable Fourth Amendment balance thus credit the government's side
> with an essential interest in readily administrable rules. *See* New York v.
> Belton, 453 U.S. 454, 458, . . . (1981) (Fourth Amendment rules " 'ought to
> be expressed in terms that are readily applicable by the police in the context
> of the law enforcement activities in which they are necessarily engaged' "
> and not " 'qualified by all sorts of ifs, ands, and buts' ").

Atwater v. City of Lago Vista, 532 U.S. 318, 347 (2001).

(1)     Probable Cause Issue.

Pugh essentially argues that the mere observance of his car after midnight in the parking lot of a closed Dollar General store located behind the Alabama Title Loan building off Highway 43 in Satsuma, Alabama, did not provide probable cause for Dix to approach his car, which consequently gave Pugh the right to evade the police and resist arrest. *See* Doc. 111. To the extent Pugh hinges his argument on a probable cause analysis, his position is without any merit. Even when an officer lacked probable cause to make an arrest, the officer's conduct may still be insulated by qualified immunity if he had "arguable probable cause" to make the arrest. Case v. Eslinger, 555 F.3d 1317, 1327 (11th Cir. 2009). "If a constitutional violation occurred because the officer lacked probable cause, we next consider whether arguable probable cause existed." *Id*. "The officer may still be shielded from liability because his actions did not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known'." *Id*., quoting Hope v. Pelzer, 536 U.S. 730, 739 (2002). *See also* Scarbrough v. Myles, 245 F.3d 1299, 1303 (11th Cir. 2001) ("Because [defendant] had arguable probable cause to arrest [plaintiff], he violated no clearly established law."); Post v. City of Fort Lauderdale, 7 F.3d 1552, 1559 (11th Cir. 1993). Arguable probable cause may be found where "reasonable officers in the same circumstances and possessing the same knowledge as the Defendant could have believed that probable cause existed to arrest." Lee, 284 F.3d at 1195 (*quoting* Scarbrough, 245 F.3d at 1302).

"[P]robable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." Case, 555 F.3d at 1327 (*citing* Illinois v.

Gates, 462 U.S. 213, 245 n. 13 (1983). "Probable cause does not require overwhelmingly convincing evidence, but only 'reasonably trustworthy information'." *Id.*, *quoting* Ortega v. Christian, 85 F.3d 1521, 1525 (11th Cir. 1996) (*quoting* Marx v. Gumbinner, 905 F.2d 1503, 1506 (11th Cir. l990). Probable cause must be assessed "not with clinical detachment but with a common sense view to the realities of normal life." *Id.*, *quoting* Wilson v. Attawa, 757 F.2d 1227, 1235 (11th Cir. l985). The probable cause determination is an objective one. *Id.*, *citing* Lee, 284 F.3d at 1188; Rankin v. Evans, 133 F.3d 1425, 133 (11th Cir. 1998). "This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition ..." *Id.*, *quoting* Saucier , 533 U.S. at 201.

As explained above, an officer need only have arguable probable cause, not actual probable cause, in order to qualify for immunity from a Fourth Amendment claim. *Id.*, *citing* Montoute v. Carr, 114 F.3d 181, 184 (11th Cir. 1997). Qualified immunity thereby protects officers who "reasonably but mistakenly conclude that probable cause is present." *Id.*, *quoting* Montoute, 114 F.3d at 184 (quotation marks and citations omitted). Thus, the qualified immunity standard is broad enough to cover some mistaken judgment, and it shields from liability all but the plainly incompetent or those who knowingly violate the law.

In this case, it is undisputed that Dix observed Pugh's car in the parking lot of a closed Dollar General store behind the Alabama Title Loans building at midnight. Although Pugh contends he was simply making a u-turn, he also contends he was in the process of making a call on his cell phone. Under the circumstances, it was not

unreasonable for Officer Dix to investigate and, because Pugh admittedly drove off when Dix drove into the area to pursue Pugh's vehicle. Pugh concedes that he first submitted to the officers' traffic stop but then "quickly" sped off before the officers could reach him, thus requiring the officers to pursue him in a chase. Dix clearly had probable cause to arrest Pugh after he attempted to flee from the officers in his car and then tried to evade them on foot. *See* United States v. Smith, 318 Fed.Appx. 780, 792-793 (11th Cir. 2009) ("Furthermore, the officers certainly had probable cause to arrest Smith after he tried to flee from Officer Henderson and then attacked him."); Nelson v. Riddle, 217 Fed.Appx. 456, 460 (6th Cir. 2007) (probable cause existed to arrest defendant for fleeing from the police, where defendant failed to stop his car when signaled to do so by officers using emergency lights and sirens). Pugh's subsequent convictions for reckless driving and attempting to elude the police arising from his actions on Highway 43 around midnight on February 12, 2007, substantiate the existence of probable cause.

(2)     The amount of force used to arrest Pugh.

As stated previously, the framework utilized by the Court for the analysis of a §1983 claim based on an alleged Fourth Amendment violation allows for a review of the reasonableness of the law enforcement official's actions based on the particular circumstances in each case. The Eleventh Circuit has summarized the process as follows:

> "The 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officer's actions are 'objectively reasonable' in light of the facts and circumstances confronting him, without regard to his underlying intent or motivation." Kesinger v. Herrington, 381 F.3d 1243, 1248 (11th Cir. 2004). "In order to determine whether the amount of force used by a police officer was proper, a court must ask 'whether a reasonable officer would believe that this level of force is

necessary in the situation at hand.' " Lee, 284 F.3d at 1197 (11th Cir. 2002) (citation omitted). This must be decided "on a case-by-case basis from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Post v. City of Fort Lauderdale, 7 F.3d 1552, 1559 (11th Cir. 1993) (internal quotation marks omitted).

Zivojinovich v. Barner, 525 F.3d 1059, 1072 (11th Cir. 2008).  In Zivojinovich, the Eleventh Circuit agreed that the Sheriff's deputies were entitled to qualified immunity despite having struck the plaintiff in the face causing a broken nose and having used a taser which caused the plaintiff's legs to give out because the deputies' conduct was reasonably proportionate to the need for force in light of plaintiff's resistance to the arrest. Id. at 1072-73.  The Court concluded that "there was no Fourth Amendment violation" and that, consequently, there was no need to address the second prong of the qualified immunity analysis. Id. at 1073.  See also Chaney v. City of Orlando, Florida, 291 Fed.Appx. 238 (11th Cir. 2008) (affirmed trial court's conclusion that the officer who pulled the plaintiff out of his car, threw him to the pavement, handcuffed him, used his Taser on plaintiff's back, or put his foot on plaintiff's head "followed police procedures, that no clearly established law provided him with notice that his actions could have been considered excessive force or unreasonable, and that his actions did not violate [plaintiff's] Fourth Amendment rights.")

Pugh admits he drove off when Officers Dix and Guy attempted to conduct a traffic stop. The officers were forced to pursue the fleeing vehicle.  Pugh complains he was caused to "wreck twice", but he was able to drive off again after his vehicle spun out the first time. (Pugh depo. (doc. 90-2) at pp. 10-11, 35-36).  Moreover, even after the car came to a stop, Pugh acknowledges that he exited the car and began running away from

the vehicle. (*Id*. at pp. 12, 39-40). The undisputed evidence shows Pugh was actively attempting to flee from the police. Pugh concedes that he was resisting arrest and that Officer Guy's attempt to use a taser to subdue him did not work. (*Id*. at pp. 12-13, 41-42, 47-48). According to Pugh, because the taser did not work and he continued to resist arrest, Dix began hitting him in the head with a metal flashlight or baton resulting in injury. (*Id*.). Pugh's contention in this regard is not only denied by Dix, but contradicted by Pugh's admission that he never advised anyone either at the Satsuma Police Department or subsequently at the Mobile County Metro Jail that he was injured and by the medical records covering Pugh's incarceration at the Metro jail[12]. Under the circumstances, the amount of force used by Dix and Guy to subdue Pugh cannot be held to have been excessive or a violation of the Fourth Amendment.[13] Consequently, Officers Dix and Guy are entitled to qualified immunity and to summary judgment in their favor on Pugh's excessive force claim.

B.    Search and Seizure Claim.

Pugh also asserts a claim for unreasonable search and seizure against Defendants Dix and Dukes as a result of the events of February 12, 2007. Pugh claims Officer Dix falsely arrested him and unreasonably searched Pugh's pants' pockets at the police

---

[12] It is inconceivable that Pugh would willingly use the Mobile Metro jail's medical services to obtain medication for his reflux but not seek assistance for an alleged serious head injury. *See*, Doc. 95.

[13] Even if, despite the medical records and Pugh's admission that he never complained of any injury, this Court accepts Pugh's contention that Dix struck him in the head to subdue him, the evidence of record would not support a contention that this force was excessive under the circumstances.

station. (Pugh depo (doc. 90-2) at pp.53-56). Pugh's claim against Dukes stems from her search of his vehicle following his arrest. (Doc. 85, p. 8, ¶ 3).

The Fourth Amendment safeguards "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV. Pursuant to Albright v. Oliver, 510 U.S. 266, 274, (1994), false arrest claims under Section 1983 are evaluated under the Fourth Amendment as unreasonable seizure claims, and not as claims for deprivation of due process under the Fourteenth Amendment. As was true with respect to the excessive force claim, the Supreme Court in Graham, *supra*, explicitly stated that "[b]ecause the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct, that Amendment, not the more generalized notion of 'substantive due process' must be the guide for analyzing these claims." 490 U.S. at 395.

As stated above, Dix had probable cause to arrest Pugh after he attempted to flee from the officers in his car and then to evade them on foot. *See* United States v. Smith, 318 Fed.Appx. 780, 792-793(11th Cir. 2009)("Furthermore, the officers certainly had probable cause to arrest Smith after he tried to flee from Officer Henderson and then attacked him."). In addition, the search of Pugh's pants' pocket by Dix was a lawful search incident to Pugh's arrest. It is well established that:

> If the police lawfully have arrested a suspect, then they may properly conduct incident to that custodial arrest a full search of the person. Such a search is reasonable under the Fourth Amendment in order to protect the police and others from any concealed weapons the suspect may have, to prevent the destruction of evidence by the suspect, and to prevent the suspect from retaining contraband (e.g., drugs) while in custody. All of these considerations apply with full force even when the lawful arrest

followed an unlawful one. We see no reason to disturb the well settled principle that a lawful search may be made incident to a legal arrest.

United States v. Bailey, 691 F.2d 1009, 1018 (11th Cir. 1982)(internal citations omitted).

Pugh has failed to show that Dix's actions amount to a constitutional violation of his clearly established rights. Accordingly, Officer Dix is entitled to qualified immunity and summary judgment in his favor on Pugh's unreasonable search and seizure claim.

Pugh's claim against Officer Dukes stems solely from her search of his vehicle following his arrest. (Pugh depo. (doc. 90-2) at pp. 65-68, 72-73). Thus, the issue is whether Dukes' warrantless inventory search of Pugh's vehicle violates the Fourth Amendment. "Whether a search and seizure is unreasonable within the meaning of the Fourth Amendment depends upon the facts and circumstances of each case…" United States v. Roberson, 897 F.2d 1092, 1096 (11th Cir.), *reh'g denied*, 907 F.2d 1145 (1990) (*quoting* Cooper v. California, 386 U.S. 58, 59 (1967)). The Supreme Court has held that searches and seizures conducted without a search warrant are per se unreasonable unless they fall within an exception. Kutz v. United States, 389 U.S. 347, 357 (1967), One exception to this warrant requirement is an inventory search. Illinois v. Lafayette, 462 U.S. 640, 643 (1983). "To uphold a warrantless search under the inventory search doctrine, the police must first have the authority to impound the vehicle and then must follow the procedure outlined in the policy." United States v. Williams, 936 F.2d 1243, 1248 (11th Cir. 1991). The Eleventh Circuit has defined the parameters of the inventory search doctrine as follows:

> Even if an arrestee's vehicle is not impeding traffic or otherwise presenting a hazard, a law enforcement officer may impound the vehicle, so long as

the decision to impound is made on the basis of standard criteria and on the basis of 'something other than suspicion of evidence of criminal activity'. If the vehicle has been lawfully impounded, the law enforcement officer may conduct an inventory search, including a search of closed containers, provided the search is conducted pursuant to standardized criteria. Because an inventory search is an exception to the Fourth Amendment's warrant requirement, however, the government officer has the burden to show that the requirements of the inventory search exception have been met. *See* Coolidge v. New Hampshire, 403 U.S. 443, 455, 91 S.Ct. 2022, 2032, 29 L.Ed.2d 564 (1971).

Sammons v. Taylor, 967 F.2d 1533, 1543 (11th Cir. 1992).

When Pugh was arrested, his vehicle was impounded and an inventory search conducted pursuant to the Satsuma Police Department policy. The procedure states that officers may impound a vehicle "when the driver of the vehicle is taken into custody by the Police Department and the vehicle would be left unattended upon the street." (Dukes Aff. (doc. 90-5) at Ex. 1 (Procedure 4.608, ¶ 2)). In this case, Pugh's car was wrecked in the ditch along Highway 43.  (Pugh depo (doc. 90-2) at p. 38).  The policy further states that if a vehicle is to be impounded following a custodial arrest, the officer will "perform an inventory search of the vehicle, including the glove compartment, and any unlocked containers, and the trunk."  (Dukes Aff. (doc. 90-5) at Ex. 1 (Procedure 4.608, Custodial Arrest, ¶ 1)). The impoundment of Pugh's vehicle was proper, the subsequent inventory search was reasonable and was conducted pursuant to the criteria contained within the Satsuma policy.  *See* Perry v. Greene County, Georgia, 392 Fed.Appx. 761, 765 (11th Cir. 2010)(Officers held entitled to summary judgment on the unreasonable search claim "because the search conducted on [plaintiff's] vehicle was a reasonable inventory search that complied with county policy."). Pugh cannot

demonstrate a constitutional violation of his clearly established rights and, consequently, Officer Dukes is entitled to qualified immunity and summary judgment in her favor on Pugh's unreasonable search and seizure claim.

CONCLUSION

For the reasons stated above, it is recommended that the motion for summary judgment filed by Richard Dix, Brent Guy, and Jana Dukes, the defendants herein, be **GRANTED** and that the motion for judgment on the pleadings filed by the plaintiff, Christopher Lenard Pugh, be **DENIED**.

The instructions which follow the undersigned's signature contain important information regarding objections to the report and recommendation of the magistrate judge.

**Done** this 27th day of May, 2011.

/s/ Katherine P. Nelson
**KATHERINE P. NELSON**
**UNITED STATES MAGISTRATE JUDGE**

# RIGHTS AND RESPONSIBILITIES FOLLOWING RECOMMENDATION
## AND FINDINGS CONCERNING NEED FOR TRANSCRIPT

Objection. Any party who objects to this recommendation or anything in it must, within fourteen days of the date of service of this document, file specific written objections with the clerk of court. Failure to do so will bar a de novo determination by the district judge of anything in the recommendation and will bar an attack, on appeal, of the factual findings of the magistrate judge. *See* 28 U.S.C. § 636(b)(1)(c); Lewis v. Smith, 855 F.2d 736, 738 (11th Cir. 1988); Nettles v. Wainwright, 677 F.2d 404 (5th Cir. Unit B, 1982)(en banc). The procedure for challenging the findings and recommendations of the magistrate judge is set out in more detail in SD ALA LR 72.4 (June 1, 1997), which provides that:

A party may object to a recommendation entered by a magistrate judge in a dispositive matter, that is, a matter excepted by 28 U.S.C. § 636(b)(1)(A), by filing a "Statement of Objection to Magistrate Judge's Recommendation" within [fourteen] days[14] after being served with a copy of the recommendation, unless a different time is established by order. The statement of objection shall specify those portions of the recommendation to which objection is made and the basis for the objection. The objecting party shall submit to the district judge, at the time of filing the objection, a brief setting forth the party=s arguments that the magistrate judge's recommendation should be reviewed de novo and a different disposition made. It is insufficient to submit only a copy of the original brief submitted to the magistrate judge, although a copy of the original brief may be submitted or referred to and incorporated into the brief in support of the objection. Failure to submit a brief in support of the objection may be deemed an abandonment of the objection.

A magistrate judge's recommendation cannot be appealed to a Court of Appeals; only the district judge's order or judgment can be appealed.

Transcript (applicable where proceedings tape recorded). Pursuant to 28 U.S.C. § 1915 and Fed.R.Civ.P. 72(b), the magistrate judge finds that the tapes and original records in this action are adequate for purposes of review. Any party planning to object to this recommendation, but unable to pay the fee for a transcript, is advised that a judicial determination that transcription is necessary is required before the United States will pay the cost of the transcript.

**Done** this 27th day of May, 2011.

/s/ Katherine P. Nelson
UNITED STATES MAGISTRATE JUDGE

---

[14] Effective December 1, 2009, the time for filing written objections was extended to "14 days after being served with a copy of the recommended disposition[.]" Fed.R.Civ.P. 72(b)(2).